UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

PAMELA DESHOTEL                    CIVIL ACTION NO. 6:16-cv-01118

VERSUS                             JUDGE DOHERTY

U.S. COMMISSIONER, SOCIAL          MAGISTRATE JUDGE HANNA
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be affirmed.

### ADMINISTRATIVE PROCEEDINGS

The claimant, Pamela Deshotel, fully exhausted her administrative remedies

before filing this action. She filed applications for disability insurance benefits and

supplemental security income benefits, alleging disability beginning on May 19,

2013.[1] Her applications were denied.[2] She then requested a hearing,[3] which was held

on July 14, 2014 before Administrative Law Judge Michael M. Wahlder.[4] The ALJ's

---

[1]     Rec. Doc. 7-1 at 134, 139.

[2]     Rec. Doc. 7-1 at 53, 54.

[3]     Rec. Doc. 7-1 at 83.

[4]     The hearing transcript is found at Rec. Doc. 7-1 at 45-52.

decision of December 11, 2014[5] concluded that the claimant was not disabled within the meaning of the Social Security Act from the alleged disability onset date through the date of the decision. The claimant requested review of the decision, but the Appeals Council concluded that there was no basis for review.[6] Therefore, pursuant to 42 U.S.C. § 405(g), the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review. The claimant then filed this action seeking review of the Commissioner's decision.

## SUMMARY OF PERTINENT FACTS

The claimant was born on September 10, 1959.[7] At the time of the ALJ's decision, she was fifty-five years old. She graduated from high school,[8] and has relevant work experience as a meat wrapper in a grocery store, a cashier in a retail store, and an account manager for a rental business.[9] She alleged that she became

---

[5]     Rec. Doc. 7-1 at 30-39.

[6]     Rec. Doc. 7-1 at 5.

[7]     Rec. Doc. 7-1 at 134, 139.

[8]     Rec. Doc. 7-1 at 46, 160.

[9]     Rec. Doc. 7-1 at 160, 165, 183.

disabled on May 19, 2013[10] due to arrhythmia, high blood pressure, high cholesterol, ulcer, herniated disc, and bulging disc.[11]

On June 3, 2008, the claimant was seen in the emergency department of American Legion Hospital in Crowley, Louisiana, after attempting suicide with an overdose of Xanax and Vicodin.[12] She told the emergency room personnel that she had been depressed due to a mentally abusive boyfriend. While hospitalized, she was seen by Dr. Neal Duhon, who found her medically stable enough for transfer to a psychiatric facility.[13] Dr. Duhon noted that the claimant told him she had two bulging cervical disks that caused headaches and had recently had injections in her neck.[14] She denied any pain other than headaches.

On June 4 through 10, 2008, the claimant was hospitalized at Crossroads Regional Hospital in Alexandria, Louisiana, pursuant to a physician emergency certificate due to a suicide attempt that started with an argument with her boyfriend and resulted in her overdosing on Xanax and Vicodin.[15] Upon admission, she was

---

[10]    Rec. Doc. 7-1 at 134, 139.

[11]    Rec. Doc. 7-1 at 55-56, 63-64, 159.

[12]    Rec. Doc. 7-1 at 424, 428-438.

[13]    Rec. Doc. 7-1 at 425-427.

[14]    There is no documentation of such treatment in the record.

[15]    Rec. Doc. 7-1 at 401-411.

diagnosed with Depressive Disorder, NOS and Impulse Control Disorder, NOS. A psychiatric evaluation showed that her insight, judgment, and impulse control were impaired. She was prescribed Cymbalta and Risperdal. Because it is not habit-forming, she was prescribed Vistaril instead of Xanax. While hospitalized, the claimant underwent a medical examination with Dr. Hussein Monir, who found that her gait, station, range of motion, and muscle tone were all normal, and she denied any specific complaints. However, the doctor noted that she had cervical radiculopathy. She was scheduled for follow-up appointments at Abbeville Community Center and Professional Counseling in Maurice, Louisiana. The claimant reported that she was disabled due to a cervical neck injury sustained at work.

The claimant received mental health services at Abbeville Community Health Center in 2008 and 2009.[16]

On April 28, 2011, the claimant was seen in the emergency department of American Legion Hospital for another overdose of prescription medications.[17] There is no indication in the treatment notes that this was a suicide attempt.

---

[16]    Rec. Doc. 7-1 at 415-422.

[17]    Rec. Doc. 7-1 at 439-449.

On May 23, 2013, the claimant saw Dr. Farha Khan at Family Health Plaza in Lafayette, Louisiana.[18] The claimant said she felt a pop in her back while lifting produce at work and then started having thoracic pain about two hours later. She requested x-rays and an MRI. She also told Dr. Khan that she had injured her back at work in December 2012 but did not seek medical attention at that time. Dr. Khan noted that she accessed hospital records from a few weeks earlier when the claimant was seen in the emergency room for back pain and given pain medication, but the record does not contain any documentation of that emergency room visit.

X-rays of the claimant's thoracic spine taken the same day showed demineralization and degenerative changes but no evidence of acute fracture, subluxation, or paraspinal soft tissue swelling.[19] An MRI taken the next day showed a minimal T7-T8 right paracentral disc protrusion without spinal cord compression.[20]

The claimant saw Dr. Ilyas Munshi, a neurological surgeon, on June 6, 2013[21] and gave a history of having sustained a back injury at work about six months earlier. She stated that she stopped working on May 24, 2013. The claimant described sharp,

---

[18]     Rec. Doc. 7-1 at 218-219, 241-243.

[19]     Rec. Doc. 7-1 at 221.

[20]     Rec. Doc. 7-1 at 220.

[21]     Rec. Doc. 7-1 at 223-226, 229-232, 235.

burning pain in the left shoulder, left scapular, and thoracic spine. She said that the pain is present every day; worsened with lifting, flexion, riding in a car, sitting, walking, and standing; and improved with rest, supine position, heat, and medications. Dr. Munshi's psychologic review of symptoms was negative for anxiety, depression, bipolar disorder, dementia, and any type of drug abuse. Upon examination, he found that the claimant's spinal alignment was normal, she was tender to palpation in the mid-thoracic region, and her range of motion was both painful and decreased. Dr. Munshi's diagnosis was herniated nucleus pulposus at T7-8 without significant spinal cord compression. He recommended two to three physical therapy sessions per week for six weeks, he prescribed Norco, and he also imposed certain restrictions on the claimant's activities: no return to work without further notice; no lifting over ten and twenty pounds; no pushing or pulling over ten and twenty pounds; no sitting, standing, or walking for more than one to two hours per day; and no twisting, bending, or stooping.

The claimant began physical therapy on July 2, 2013,[22] and the record documents seven physical therapy visits.[23]

---

[22]    Rec. Doc. 7-1 at 236-238.

[23]    Rec. Doc. 7-1 at 239-240.

The claimant returned to see Dr. Munshi on July 18, 2013.[24]  She reported attending physical therapy and stated that she was still experiencing pain.  Dr. Munshi noted that she did not need surgery and should be able to return to light duty work as tolerated with the following restrictions:  no pushing or pulling over twenty pounds; no lifting over twenty pounds; no sitting, standing, or walking for more than seven to eight hours per day; no overhead reaching; and no climbing.

On August 5, 2013, the claimant was seen by Dr. Donald R. Smith of Functional Capacity Experts for a second medical opinion at the request of the claimant's workers' compensation insurer.[25]  The claimant gave a history of having been in two prior accidents.  First, she said she was struck on the head when a TV fell from an overhead rack in 2008, resulting in chronic headaches and requiring that she undergo several epidural steroid injections.[26]  She also reported having had surgery for occipital neurectomy,[27] which gave fairly good relief from the headaches and upper neck pain.  She reported treating with a pain management specialist[28] following the first accident, and stated that she took four Lortab 10 mg pills each day for the

---

[24]    Rec. Doc. 7-1 at 227-228.

[25]    Rec. Doc. 7-1 at 244-246.

[26]    There is no evidence in the record documenting any such medical treatment.

[27]    There is no evidence in the record documenting this procedure.

[28]    The record contains no evidence of pain management treatment at any time.

previous two years while continuing to work. Second, the claimant reported that, in December 2012, she felt a popping sensation in her midthoracic region while lifting a box from an overhead rack. She reportedly worked until May 23, 2013, then stopped working due to pain. She told Dr. Smith that she went to physical therapy for about two weeks but stopped because it aggravated her pain. She also told him that the pain management doctor stopped treating her after the second accident.

Upon examination, Dr. Smith found the claimant to have a normal gait and the ability to heel and toe walk. She complained of pain with palpation of the midthoracic region and with all movements associated with that area of the body. Her cervical range of motion was mildly limited due to stiffness without severe pain. She had normal deep tendon reflexes in her upper and lower extremities, her motor function was normal throughout, and she had no loss of sensation in any region. Dr. Smith reviewed her thoracic spine MRI from May 23, 2013 and found that the very minimal disk bulge at T7-8 was "probably in keeping with a patient in this age group." In Dr. Smith's opinion, the claimant did not need ongoing treatment for the disk bulge at T7-8, did not need further diagnostic testing, and did not need referrals for physical therapy or surgery. He found her to be at maximum medical improvement with regard to the injuries sustained in both incidents. However, he recognized that the treatment she received for the first injury had resulted in

habituation and long-term use of narcotic pain medication. In his opinion, she was able to perform medium work without heavy lifting. He related the lifting restriction to both the midthoracic complaints and the earlier cervical problem.

The claimant returned to Dr. Munshi on January 16, 2014 for a six-month follow-up visit.[29] She complained of burning pain in the mid-scapular region, radiating to both shoulders. She stated that long periods of sitting and activity made the pain worse while it was usually relieved by rest and heat. She was not taking any prescription pain medication. Dr. Munshi's examination of the thoracic spine showed tenderness to palpation on both sides, a decreased range of motion, and pain with motion. Dr. Munshi recommended a functional capacity evaluation to see what kind of work activity the claimant could perform.

The claimant's functional capacity was evaluated at Laborde Therapy Center on February 17, 2014.[30] The claimant rated the least pain she had experienced over the past thirty days at 5/10 while she rated her pain on the day of the evaluation at a 10/10 both before and after the testing. She complained of burning pain in the scapular region throughout the testing. The physical therapist who conducted the evaluation concluded that the claimant was capable of performing only sedentary

---

[29]     Rec. Doc. 7-1 at 352-354.

[30]     Rec. Doc. 7-1 at 250-272, 357-359.

work.  However, she also noted that, in three of seven categories tested, the claimant displayed inappropriate illness behavior.  Furthermore, she found the results of the testing invalid in two of the six categories tested.

The claimant saw Dr. Munshi again on March 11, 2014.[31]  She reported that her pain was unchanged since the last visit.  Based on the results of the recent functional capacity evaluation, Dr. Munshi opined that the claimant could return to work at the sedentary level.

On April 27, 2014, the claimant was seen in the emergency room at American Legion Hospital for low back pain radiating into her right leg that she stated came on while lifting a mattress to change the sheets.[32]  The clinical impression was lumbrosacral strain.  She was given a cortisone injection, a dose of diazepam for anxiety, and a hydrocodone tablet.  She was discharged with prescriptions for Flexeril, Norco, and Prednisone.

On May 23, 2014, the claimant was again seen in the emergency room at American Legion Hospital.[33]  Although she denied suicidal ideation, stating that she "just wanted to take a nap," she had overdosed on Flexeril, Xanax, and Seroquel.  The

---

[31]     Rec. Doc. 7-1 at 355-356.

[32]     Rec. Doc. 7-1 at 319-351.

[33]     Rec. Doc. 7-1 at 273-318.

clinical impression was that the overdose was accidental, and it was noted that the claimant did not have a depressed mood or affect.

On July 13, 2014, the claimant testified at a hearing regarding her symptoms and her medical treatment. She stated that she was injured on the job when lifting boxes and something popped in the middle of her back.[34] She complained of pain between her shoulder blades,[35] which she described as a sharp burning pain.[36] She stated that she needs assistance getting in and out of the bathtub,[37] can neither sit nor stand for long because of back pain,[38] and sits in the cry room at church because she has to change positions frequently.[39] She testified that she does very little grocery shopping, does not clean house, and cooks very little, leaving those tasks to her fiancé.[40] At the time of the hearing, she was not taking any prescription pain medication, but she was taking Prozac, Trazodone, and Xanax.[41] She testified that

---

[34]  Rec. Doc. 7-1 at 46.

[35]  Rec. Doc. 7-1 at 47.

[36]  Rec. Doc. 7-1 at 51.

[37]  Rec. Doc. 7-1 at 47.

[38]  Rec. Doc. 7-1 at 48.

[39]  Rec. Doc. 7-1 at 48.

[40]  Rec. Doc. 7-1 at 47-49.

[41]  Rec. Doc. 7-1 at 50.

she had previously taken prescription painkillers but her doctor had stopped prescribing them because she abused them, taking two narcotic pain medications at the same time.[42]  Her doctor told her to take Advil and Aleve for pain instead, but she testified that those medications do not relieve her pain.[43]  She also stated that her doctor told her not to lift more than ten pounds.[44]

The ALJ referred the claimant to Dr. Mark H. Dawson for a consultative examination internal medicine examination, which was conducted on September 15, 2014.[45]  The claimant gave a history of having herniated and bulging discs in her neck following an accident in 2012.  She stated that an MRI showed two herniated discs in her neck,[46] and she reported that her occipital nerve had been clipped,[47] which helped somewhat with the pain.  She claimed to have had hypertension, peptic ulcer disease, and general anxiety disorder in the past as well as a tubal ligation, hysterectomy, and bladder surgery.  Her current medications were Metoprolol, Prozac, and Trazadone.  She complained of pain throughout her upper back.  The

---

[42]    Rec. Doc. 7-1 at 49-50.

[43]    Rec. Doc. 7-1 at 51.

[44]    Rec. Doc. 7-1 at 51.

[45]    Rec. Doc. 7-1 at 391-398.

[46]    No such MRI results are set forth in the record.

[47]    The record contains no evidence of such a procedure.

range of motion in her neck was good. She was a bit stiff in the lumbrosacral spine and could not touch past her knees. She could walk on her heels and toes without difficulty, and her gait was normal. Dr. Dawson saw no evidence of erythema or high cholesterol, he noted that her blood pressure was borderline controlled, and he stated that her peptic ulcer disease was probably healed. He filled out a Medical Source Statement of Ability to do Work-Related Activities, in which he opined that the claimant had no limitations of any sort; in particular, he found that she had no limitations on lifting or carrying; no limitations on sitting, standing, or walking; no limitations in the use of her hands or feet; and no limitations on postural activities. His report does not mention any psychological or mental health impairments.

After the ruling was issued, the claimant submitted additional evidence, establishing that she was seen in the emergency room of the Jennings, Louisiana American Legion Hospital on January 6, 2015 due to a suicide attempt by overdosing on Xanax.[48]

## ANALYSIS

### A.  STANDARD OF REVIEW

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the

---

[48]      Rec. Doc. 7-1 at 13-26.

proper legal standards were used in evaluating the evidence.[49] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[50] Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[51]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[52] In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[53] Conflicts in the evidence[54] and credibility assessments[55] are for the Commissioner to resolve, not the courts. Four elements of proof are weighed by the courts in determining if substantial

---

[49] *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[50] *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[51] *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[52] 42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[53] *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[54] *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[55] *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[56]

## B.    ENTITLEMENT TO BENEFITS

The Disability Insurance Benefit program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[57]  Every individual who meets certain income and resource requirements, has filed an application for benefits, and is determined to be disabled is eligible to receive Supplemental Security Income benefits.[58]

A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[59]  A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable

---

[56]    *Wren v. Sullivan*, 925 F.2d at 126.

[57]    See 42 U.S.C. § 423(a).

[58]    42 U.S.C. § 1382(a)(1) & (2).

[59]    42 U.S.C. § 1382c(a)(3)(A).

to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[60]

## C. EVALUATION PROCESS AND BURDEN OF PROOF

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled. This process requires the ALJ to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[61] "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."[62]

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[63] by determining the most the claimant can still

---

[60]     42 U.S.C. § 1382c(a)(3)(B).

[61]     20 C.F.R. § 404.1520.

[62]     *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

[63]     20 C.F.R. § 404.1520(a)(4).

do despite his physical and mental limitations based on all relevant evidence in the record.[64]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[65]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[66]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[67]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[68]

_____

[64]      20 C.F.R. § 404.1545(a)(1).

[65]      20 C.F.R. § 404.1520(e).

[66]      *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[67]      *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[68]      *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

## D.    THE ALJ'S FINDINGS AND CONCLUSIONS

he ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since May 24, 2013, the alleged disability onset date.[69]  This finding is supported by substantial evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairment:  disorders of the back.[70]  This finding is supported by substantial evidence in the record.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[71]  The claimant does not challenge this finding.

The ALJ found that the claimant has the residual functional capacity to perform the full range of medium work.[72]  The claimant challenges this finding.

At step four, the ALJ found that the claimant is capable of performing her past relevant work as a cashier.[73]  The ALJ did not stop the analysis at the point and

---

[69]      Rec. Doc. 7-1 at 32.

[70]      Rec. Doc. 7-1 at 32.

[71]      Rec. Doc. 7-1 at 34.

[72]      Rec. Doc. 7-1 at 35.

[73]      Rec. Doc. 7-1 at 38.

alternatively found that there are jobs in the national economy that she can perform.[74]

The ALJ found that the claimant was not disabled from May 24, 2013 (the alleged

disability onset date) through December 11, 2014 (the date of the decision).[75]  The

claimant challenges this finding.

## E.    THE ALLEGATIONS OF ERROR

The claimant contends that the ALJ erred (1) in failing to consider whether her

mental condition, in combination with the severe disorder of her spine, is disabling;

(2) in failing to give appropriate weight to the opinions of her treating physician; and

(3) in failing to find the claimant disabled under Grid Rule 201.12 or 201.14.

## F.    THE ALJ DID NOT ERR IN EVALUATING THE CLAIMANT'S MENTAL HEALTH IMPAIRMENTS

The claimant contends that the ALJ erred in failing to find that her mental

health impairments, when combined with her physical impairments, are disabling.

When she applied for Social Security benefits, the claimant did not list any mental

health conditions among the impairments that she identified as disabling.  At the

hearing, she stated that she was taking Prozac, Trazodone, and Xanax, all of which

are prescribed for mental health conditions, but she did not mention any mental health

---

[74]    Rec. Doc. 7-1 at 39.

[75]    Rec. Doc. 7-1 at 39.

conditions or impairments. She testified that she could no longer work due to the on-the-job injury to the middle of her back. The evidence in the record shows that the claimant stopped working in May 2013 on the day after she reported to Dr. Khan that she had been injured on the job. Nevertheless, the ALJ's ruling contains a summary of the treatment notes in the record concerning the claimant's mental health, and the ALJ concluded that there was no objective medical evidence of a medically-determinable mental impairment except the narcotic drug habituation, which had ceased by the time the ruling was written.

At the time that the ALJ issued his ruling, the record did not contain evidence that the claimant attempted suicide by drug overdose in 2008, was treated in 2008-2009 for mental health issues, and attempted suicide again in 2015. The claimant's counsel submitted evidence related to those events to the Appeals Council after the ALJ rendered his ruling. However, the Appeals Council reviewed all of the evidence regarding those events and concluded that the evidence of medical treatment before the ruling was issued "does not provide a basis for changing the Administrative Law Judge's decision."[76] The Appeals Council further concluded that the medical evidence from 2015 had to do with a time later than the date on which the ruling was

---

[76]    Rec. Doc. 7-1 at 6.

issued and, consequently, "does not affect the decision about whether you were disabled beginning on or before December 11, 2014."[77]

Substantial evidence in the record supports the Appeals Council's conclusions. While a court may order additional evidence to be taken or considered after an ALJ has rendered a decision, there must be "a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."[78]  Furthermore, "in order to justify a remand, the evidence must be (1) new, (2) material, and (3) good cause must be shown for the failure to incorporate the evidence into the record in a prior proceeding."[79]  "New" evidence is that which was "not in existence at the time of the administrative. . . proceedings"[80] and is "not merely cumulative of what is already in the record."[81] Aside from the evidence related to the 2015 suicide attempt, the evidence submitted by the claimant after the hearing was in existence at the time the ALJ made his

---

[77]        Rec. Doc. 7-1 at 6.

[78]        42 U.S.C. § 405(g).

[79]        *Leggett v. Chater*, 67 F.3d 558, 567 (5th Cir. 1995) (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1058 (5th Cir. 1987)).

[80]        *Haywood v. Sullivan*, 888 F.2d 1463, 1471 (5th Cir. 1989).

[81]        *Pierre v. Sullivan*, 884 F.2d 799, 803 (5th Cir. 1989).

decision, but the claimant failed to include this evidence in the record. No good cause was shown for this omission.

For new evidence to be material, it must be relevant and probative and there must be a reasonable possibility that it would have changed the outcome of the Commissioner's decision.[82] The evidence must also relate to the time period for which benefits were denied.[83]

Some of the evidence submitted to the Appeals Council had not previously been included in the record, but some of it was duplicative of evidence already in the record. This evidence documented mental health treatment from 2008, 2009, 2011, and 2014. The claimant contends that she became disabled in May 2013, and there is no evidence in the record linking the claimant's mental health in 2008, 2009, 2011, or 2014 with the alleged onset of disability. The record contains evidence that the claimant overdosed on prescription medications on four occasions, i.e, June 4, 2008, April 28, 2011, May 23, 2014, and January 6, 2015. The record also indicates that the claimant was diagnosed with depression and anxiety following the first overdose, and received mental health treatment for two years thereafter. However, there is no

---

[82]     *Hamilton-Provost v. Colvin*, 605 Fed. App'x 233, 238 (5th Cir. 2015); *Latham v. Shalala*, 36 F.3d 482, 483 (5th Cir. 1994); *Chaney v. Schweiker*, 659 F.2d 676, 679 (5th Cir. 1981).

[83]     *Castillo v. Barnhart*, 325 F.3d 550, 551-52 (5th Cir. 2003); *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995).

evidence in the record that the claimant stopped working – or encountered difficulties at work due to mental health concerns – while undergoing mental health treatment. Similarly, there is no evidence that anxiety, depression, or drug abuse caused the claimant to stop working. To the contrary, the evidence establishes that the claimant stopped working in May 2013, on the day after the on-the-job injury to her mid-back. Furthermore, when the claimant saw Dr. Munshi for the first time, on June 6, 2013, Dr. Munshi conducted a psychologic review of symptoms that was negative for anxiety, depression, bipolar disorder, dementia, and any type of drug abuse. In August 2013, the claimant told Dr. Smith that she stopped working due to the pain caused by the accident. There is no indication in Dr. Smith's report that the claimant told him she had ever been diagnosed with or treated for any psychological or psychiatric condition or impairment. Although the claimant testified that she was taking Prozac (an antidepressant), Trazodone (an antidepressant), and Xanax (an anti-anxiety medication) at the time of the hearing in July 2014, the record does not indicate what physician was prescribing these medications nor does it contain treatment notes documenting any type of mental health treatment after 2009. Following the hearing, the claimant was examined by Dr. Dawson. She reported to him that she was taking Metoprolol (a beta blocker), Prozac, and Trazadone but the physician who prescribed those medications was not identified. She also reported to

Dr. Dawson that she had a general anxiety disorder. Again, however, the history she gave to Dr. Dawson did not link the alleged onset of disability with any mental health condition or impairment. Dr. Dawson did not find that the claimant had any mental impairments that affected her ability to perform work-related activities.

The evidence from 2008, 2009, 2011, and 2015 that was submitted to the Appeals Council did not pertain to the time period that was adjudicated in the ALJ's ruling. Therefore, even if this evidence established that the claimant's mental health impairments are severe, either when considered on their own or when considered in combination with her other impairments, the evidence is not material to conclusions reached by the ALJ and does not require that his decision be reconsidered. This Court concludes that the Appeals Council did not err in finding this evidence does not require remand of the ALJ's decision.

## G.    THE ALJ DID NOT ERR IN WEIGHING THE MEDICAL OPINIONS

Dr. Munshi is the claimant's treating physician, and on March 11, 2014, he opined that the claimant could return to work so long as she was restricted to working at the sedentary level.[84] The claimant contends that the ALJ erred in failing to give controlling weight to Dr. Munshi's opinion concerning her functionality. The Social

---

[84]      Rec. Doc. 7-1 at 355-356.

Security regulations and rulings explain how medical opinions are to be weighed.[85] Generally, the ALJ must evaluate all of the evidence in the case and determine the extent to which medical source opinions are supported by the record.

Ordinarily, a treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with. . . other substantial evidence."[86] However, "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion."[87] When rejecting the medical opinion of a treating physician, the ALJ must provide an explanation supported by good cause.[88]

In this case, Dr. Munshi's opinion that the claimant can perform only sedentary work was solely based on a functional evaluation performed by physical therapist. His opinion was not based on his own evaluation of the claimant's functionality. Although the physical therapist found the overall result of the evaluation to be valid, she found that the claimant displayed inappropriate illness behavior in three of seven

---

[85]     20 C.F.R. § 404.1527(c), § 416.927(c), SSR 96-2p, SSR 96-5p.

[86]     20 C.F.R. § 404.1527(d)(2).

[87]     *Martinez v. Chater*, 64 F.3d at 175-76 (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)).

[88]     See *Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir. 2000).

categories tested, and she found the results of the testing invalid in two of the six categories tested.  For that reason, the ALJ found that the results of the evaluation "questionable" and gave both the evaluation itself and Dr. Munshi's opinion relying on the evaluation no weight.  Additionally, consultative examiner Dr. Smith evaluated the claimant and found that she was able to perform medium work without heavy lifting.  The ALJ noted that Dr. Smith's analysis was consistent with that of the state agency analyst, and the ALJ gave great weight to their opinions while giving no weight to those of the physical therapist and Dr. Munshi.

The ALJ has sole responsibility for determining the claimant's disability status.[89]  If an ALJ declines to give controlling weight to a treating doctor's opinion, he may give the opinion little or no weight – but only after showing good cause for doing so.[90]  Good cause may be shown if the treating physician's opinion is conclusory, unsupported by medically acceptable clinical laboratory diagnostic techniques, or is otherwise unsupported by the evidence.[91]  In this case, the ALJ had two reasons for discounting Dr. Munshi's opinion – it was based on a flawed functional evaluation that Dr. Munshi did not conduct, and it was inconsistent with

---

[89]    *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).

[90]    *Thibodeaux v. Astrue*, 324 Fed. App'x 440, 443-444 (5th Cir. 2009).

[91]    *Thibodeaux v. Astrue*, 324 Fed. App'x at 443-444.

the results of Dr. Smith's examination of the claimant. This Court finds that the ALJ did not err in weighing the medical opinions. Perhaps more important is the fact that even if Dr. Munshi's opinion were adopted by the ALJ, there would be no basis for finding the claimant disabled, since Dr. Munshi's opinion was that she could perform sedentary work.

## H. THE ALJ DID NOT ERR IN FAILING TO APPLY GRID RULES 201.12 AND 201.14

The claimant contends that the Medical-Vocational Guidelines, also known as "the Grids," should have been applied in this case, and she further contends that application of Grid Rule 201.12 or 201.14 would have resulted in a finding that she is disabled. Under Grid Rule 201.12, a person who is closely approaching advanced age (i.e., 50 to 54 years old) with a high school education or more, with a history of unskilled work, and who has a residual functional capacity to do only sedentary work, is classified as disabled; under Grid Rule 201.14, a person who is 50 to 54 years old, with a high school education or more, with a history of skilled or unskilled work whose skills are not transferable, and who has a residual functional capacity to do only sedentary work is also classified as disabled.[92]

---

[92]     20 C.F.R. Pt. 404, Subpt. P, App. 2.

There are two reasons why application of the Grids was not appropriate in this case. First, use of the Grid Rules "is only appropriate 'when it is established that a claimant suffers only from exertional impairments, or that the claimant's nonexertional impairments do not significantly affect his residual functional capacity.'"[93] If, however, the claimant suffers from nonexertional impairments or a combination of exertional and nonexertional impairments, then the Commissioner must rely on a vocational expert to establish that there are jobs in the national economy that the claimant can perform.[94] In this case, the claimant's primary complaint is back pain. Since pain may constitute a nonexertional factor that can limit the range of jobs a claimant can perform,[95] an ALJ must rely on expert vocational testimony to establish that jobs exist when the claimant contends that her functional capacity is limited by pain.[96]

Second, the use of the Grids is only appropriate if the fifth step in the sequential analysis is reached.[97] In this case, the ALJ found, at Step Four, that the

---

[93]    *Watson v. Barnhart*, 288 F.3d 212, 216 (5th Cir. 2002) (quoting *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999)).

[94]    *Newton v. Apfel*, 209 F.3d at 458.

[95]    *Carter v. Heckler*, 712 F.2d 137, 142 (5th Cir. 1983).

[96]    *Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994).

[97]    *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).

claimant is capable of performing her past relevant work as a cashier. For that reason, the ALJ could have concluded the analysis at that point, and resort to the Grids would not have been justified. In this case, the ALJ proceeded to Step Five, "[i]n the alternative,"[98] and relied upon testimony from a vocational expert who testified at the hearing that there is work in the national economy that the claimant can perform. The ALJ's reliance on the vocational expert's testimony precluded the use of the Grids.[99]

Accordingly, the ALJ did not err in failing to apply the Grids in this case, and the ALJ's failure to apply the Grids does not require remand of his decision.

### CONCLUSION AND RECOMMENDATION

**IT IS THE RECOMMENDATION** of this Court that the decision of the Commissioner be **AFFIRMED** and this matter be dismissed with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after

---

[98]     Rec. Doc. 7-1 at 39.

[99]     See *Varnado v. Colvin*, No. 14-1581, 2015 WL 3505108, at *6 (E.D. La. June 3, 2015).

receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[100]

Signed in Lafayette, Louisiana, this 28th day of July 2017.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[100]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).